**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert Allen JOHNSON, Roy Maxwell Lister and Ira Hill, Jr.,**
**Defendants-Appellants.**

**No. 82–3205.**

United States Court of Appeals,
Eleventh Circuit.

April 23, 1984.

684

Robert J. Vossler, Tallahassee, Fla., for Johnson.

John D. O'Brien, Panama City, Fla., for Hill.

Paul G. Komarek, Panama City, Fla., for Lister.

David L. McGee, Pensacola, Fla., for United States.

Before GODBOLD, Chief Judge, RONEY and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

The appellants, Ira Hill, Jr., Roy Lister and Robert Johnson, were indicted on one count of conspiracy to submit false statements to a federal agency and eleven counts of submitting false statements and documents to federal agencies in violation of 18 U.S.C. § 1001. A jury found all three appellants guilty of conspiracy. Additionally, Hill was convicted of eight of the

eleven counts of submitting false statements and documents, Johnson of five, and Lister of four.

The convictions arose out of Hill's attempt to sell various businesses by financing the sales through loans guaranteed by the Small Business Administration (SBA) and the Farmers Home Administration (FHA), both of which are federal agencies. The loan applications were first submitted to the Wewahitchka State Bank, where they were reviewed and recommended to the federal agencies by defendant Lister, then president of the bank and officer in charge of the loans. Defendant Johnson was the prospective purchaser of one of the businesses, Florida Trailer Sales (FTS), and Pamela Wells, the woman he lived with, was the prospective buyer of another business, Eastgate Mobile Home Park. Hill also attempted to obtain a loan guarantee from the SBA for the sale of the Big Chief Truck Stop to another individual, Joe Dasinger.

The government contended at trial that the documents submitted to the SBA and FHA contained a number of false statements. These statements formed the basis for the various counts in the indictment:

(1) In the personal history form for Johnson submitted to the SBA to guarantee the purchase of FTS, it was represented that Johnson had never been arrested for, charged with, or convicted of a criminal offense. Johnson had in fact been convicted of two prior felonies. All three defendants were convicted of this count (Count II) [1].

(2) A representation to the SBA that a $50,000.00 deposit had been paid by Johnson towards the purchase of FTS, which the government contended had not actually been made (Count III). All three defendants were acquitted by the jury on this charge.

(3) A representation in the personal financial statement to the SBA that Johnson had assets exceeding his liabilities of $83,000.00 (Count IV). The jury found only Johnson guilty of this charge.

(4) A representation to the SBA that Johnson had made an additional $10,-000.00 down payment toward the purchase of FTS, which the government contended had not been made (Count V). Johnson and Hill were found guilty; Lister's motion for a directed verdict was granted.

(5) A statement in Hill's personal history form for the purchase of FTS that he had never been arrested for, charged with, or convicted of a criminal offense, when he had in fact been previously convicted of two counts of tax evasion (Count VI). Hill and Lister were found guilty on this count; Johnson's motion for a directed verdict was granted.

(6) A letter from Lister to the SBA stating that Hill intended to purchase FTS from his father, when allegedly Hill already owned the business (Count VII). Lister and Hill were found guilty on this count; Johnson's motion for a directed verdict was granted.

(7) A representation to the SBA in Hill's financial statement for the purchase of FTS that Hill's net worth was $163,-000.00, which the government alleged was untrue (Count VIII). Hill and Lister were found guilty; Johnson's motion for a directed verdict was granted.

(8) A representation to the FHA in a loan application for the purchase of Eastgate Mobile Home Park that Hill's net worth was 3.3 million dollars, which the government alleged was untrue (Count IX). Hill was found guilty and Lister was acquitted; Johnson's motion for a directed verdict was granted.

(9) A representation to the FHA that Pamela Wells had made a $5,000.00 down payment towards the purchase of Eastgate, and would make an additional down payment of $35,000.00 at closing, which representations the government alleged were untrue (Count X). Hill and Johnson

---

**1.** Count I charged the defendants with conspiracy to submit false statements, with the remaining counts alleged as the overt acts taken to effectuate the conspiracy.

were found guilty and Lister was acquitted.

(10) A statement to the FHA that Wells' assets exceeded her liabilities by $126,800.00, which the government alleged was untrue (Count XI). Johnson was found guilty and Hill was acquitted; Lister's motion for a directed verdict was granted.

(11) A representation to the SBA that Joe Dasinger had made a $10,000.00 down payment toward the purchase of the Big Chief Truck Stop, which the government contended was untrue (Count XII). Hill was found guilty; Johnson and Lister's motions for directed verdicts were granted.

The government attempted to prove the allegations mainly through the testimony of Nick Mason, Hill's Certified Public Accountant. Mason testified at length how he, Hill and Johnson had knowingly falsified information in an attempt to secure the loan guarantees for the various sales. Mason also testified about two transactions, unrelated to the charges, in which Hill, Lister and Johnson allegedly had engaged in similar fraudulent schemes.

The government called several other witnesses. FBI Special Agent Gene Halley related how Johnson had confessed that he, Hill, Mason and Lister had embarked upon a scheme to fraudulently obtain government loan guarantees. Pamela Wells, the prospective purchaser of the Eastgate Mobile Home Park, testified that the financial information she had provided was false and that the falsified information was submitted with the knowledge of Hill and Mason.

All three defendants took the stand. Both Johnson and Hill readily admitted that they had prior convictions, but contended that they had relied on Mason to fill out the SBA and FHA applications and were unaware that Mason had falsified the applications in this respect. They also tes-

tified that their statements of financial worth and the disputed down payments were basically accurate and that any false statements were made without their knowledge. Lister's main defense was that he had failed to review the applications and thus was unaware of the false statements in the applications. He also denied knowledge of the allegedly non-existent down payments.

## I. The Expert Advice Instruction

The appellants first contend that the trial court erred in denying their request for an instruction on the defense of good faith reliance on an expert. They argue that they were entitled to such an instruction because their main defense at trial was that they had relied on their CPA, Nick Mason, as an expert in filling out SBA and FHA applications for loan guarantees. The trial court refused to give the instruction because it found that the defense was inapplicable to the facts of the case. We agree.

■ The defense of good faith reliance on expert advice is "designed to refute the government's proof that the defendant intended to commit the offense." *United States v. Miller*, 658 F.2d 235, 237 (4th Cir.1981). To succeed, the defendant must show that (1) he fully disclosed all relevant facts to the expert and (2) that he relied in good faith on the expert's advice. *United States v. Smith*, 523 F.2d 771 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976).[2]

■ The flaw in the defendants' argument is that no expert advice was given to the defendants on which they relied. The charges against Hill, Johnson and Lister are not of the type where reliance on expert advice is relevant:

(1) Hill and Johnson do not contend that Mason advised them to lie about their

---

**2.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions

past criminal records,[3] but simply that they were unaware that the false statements were included in the applications. (2) The appellants also do not argue that they relied on Mason in calculating either theirs or Pamela Wells' financial assets, but instead claim that the statements were in fact substantially accurate and they did not know of any inaccuracies. (3) Likewise, they do not claim that Mason advised them to falsely claim that down payments had been made, but rather that the down payments had either been made or that they did not knowingly claim that nonexistent down payments had been made. (4) Finally, although Hill testified at trial that Mason advised him to transfer the stock of I & E Corporation to his father, the issue at trial was not whether such a transaction was legal (to which the defense would arguably apply), but whether the transfer of stock ever took place, which reliance on expert advice was not relevant.

The appellants' defenses at trial, therefore, are properly characterized as claims that they did not willfully and knowingly make false statements,[4] and not as contentions that they relied on expert advice in making such statements.

The district court was not required to "grant a request that [did] not concern issues properly before the jury ...." *United States v. Goss*, 650 F.2d 1336, 1344 (5th Cir. Unit A 1981). The court did not err, therefore, in denying the appellants' request for an instruction on the expert advice defense.

## II. The Curative Instruction for Defendant Hill's Outburst

■ During Mason's testimony, Hill stated in a loud voice, "He is lying." The court dismissed the jury and informed defense counsel that he intended to give a curative instruction to the effect,

> Any comments you may have heard in the courtroom from people not under oath should be disregarded by you and play no part in your decision.

Defense counsel made no objection to the proposed instruction, and the court proceeded to give substantially the same instruction to the jury:

> Ladies and gentlemen of the jury, immediately prior to the break there was some statement made by some individuals in the courtroom who were not at that time testifying under oath. I would advise you that any comments you may have heard in this courtroom from people who are not under oath, should be disregarded by you and play no part in the consideration of your verdict. Do you understand that? Do you have any problems with that? All right.

Again, none of the defendants objected.

Johnson and Lister now argue that the instruction's references to "some individuals" and to "people" prejudicially implied that they were responsible for Hill's outburst. The argument is frivolous. The judge's proposed instruction referred to "people," but the defendants did not object; nor did they object when the charge was given to the jury. Without an objection, the instruction must have constituted "plain error" for us to consider it. *United States v. Smith*, 700 F.2d 627 (11th Cir. 1983). The alleged error here, however, was not "both obvious and substantial" and thus does not warrant our consideration. *See id.*

## III. Limiting the Number of Character Witnesses

Appellant Johnson next argues that the district court erred in limiting the number of character witnesses that the defense

---

of the former Fifth Circuit rendered prior to October 1, 1981.

**3.** Indeed, if they had claimed that they relied on Mason's advice in lying about their criminal records, such a claim would clearly be outside

of the "good faith" prong of the expert advice defense.

**4.** The appellants do not argue that the district court erred in its instructions on what constitutes "wilfully" and "knowingly."

could call to testify as to Mason's truthfulness.[5] Hill's counsel had called three witnesses who testified to their lack of trust in Mason, after which the government made a motion to prevent further character evidence against Mason. Hill's counsel indicated that he had no additional character witnesses, and the court noted, "that took care of itself."

The government argues, based on the above exchange, that the trial court never actually ruled on the government's motion to limit character evidence. When a later witness was on the stand, however, Hill's counsel stated, "Your Honor, again, I would proffer the testimony of this witness in regards to the truthfulness of Nick Mason." The government objected and the trial court ruled that the testimony would be cumulative.[6] We find, therefore, that the trial court did limit the amount of character evidence against Mason.

■ The decision to limit the number of character witnesses and the amount of character evidence is within the trial court's discretion. *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The appellants maintain that here the trial judge improperly limited the number of character witnesses to three, citing for support *United States v. Gray*, 507 F.2d 1013 (5th Cir.1975). *Gray*, however, stands only for the proposition that a trial judge should not use an "unvarying rule" as to the number of character witnesses allowed without regard for the circumstances of the case, because such a "rule" would be arbitrary and not an exercise of discretion. *Gray* is inapplicable to the case at hand, as the judge did not rely

on an "unvarying rule" but determined that any further character evidence would be "cumulative." Nor do we find after reviewing the record that the district court abused its discretion in limiting the number of character witnesses or the amount of character evidence against Mason. We agree with the district court that the three character witnesses called by the defense were given ample opportunity to express their distrust of Mason, and that any further testimony would not have significantly aided the jury in assessing Mason's credibility.

## IV. Sufficiency of the Evidence

■ Both Johnson and Lister challenge the sufficiency of the evidence for their convictions. Such challenges are governed by the standard outlined in *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B) (en banc), *aff'd on other grounds*, — U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983):

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

In making this assessment, an appellate court must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accept reasonable inferences and credibility choices by the factfinder, *United States v. Gonzalez*, 719 F.2d 1516, 1521–22 (11th Cir.1983).

---

**5.** Hill adopts Johnson's argument. Lister also purports to adopt Johnson's argument, but states that his objection is to the limitation of cross-examination of Mason and Pat Lister. He points to no prejudicial error in those instances where the trial court limited questioning of Mason and we find that sufficient cross-examination was allowed such that the court did not abuse its discretion. *Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir.1981). The limitation on the questioning of Pat Lister came during direct, not cross-examination, and thus at most is an

argument that the court improperly limited character evidence, *see infra* note 5.

**6.** Johnson also points to the direct examination of Pat Lister where she was asked "Has [Mason] on occasion lied to you," and the government's general objection was sustained. It is unclear as to whether the government was objecting on hearsay grounds or because her reply would be character evidence. Because we find that the court did limit the defense's introduction of character evidence, we need not decipher the basis of the court's ruling.

## A. Johnson's Convictions

■ Applying the *Bell* standard in viewing the evidence in the light most favorable to the government, *Glasser, supra,* there is ample evidence to support Johnson's convictions for conspiracy and his other convictions arising out of the FTS and Eastgate loan guarantee applications.

First, we find there is sufficient evidence to support Johnson's conviction for conspiracy to submit false statements to a federal agency. Mason, whose credibility was an issue for the jury, directly testified to a number of occasions where he, Hill and Johnson together discussed how to fraudulently obtain federal loan guarantees. Moreover, when asked by the FBI "if he could testify to the fact that Hill, Lister and Mason conspired together and brought the forms to him to sign in regard to the SBA loan and that Johnson knew these loans to be false," Johnson replied "that's the truth of the matter." As the discussion below of Johnson's conviction for false statements also makes evident, a reasonable jury would have had no trouble concluding beyond a reasonable doubt that overt acts were done in furtherance of the conspiracy.

Mason testified directly to Johnson's knowledge of the false statements in the FTS application. He stated that Johnson knew the personal history forms claimed that Johnson had no prior convictions and that he, Johnson and Hill had laughed about the form as they filled it out. Likewise, Mason testified that Johnson knew that the financial statement claiming Johnson had a net worth of $83,000 was false and that he and Johnson had together come up with the figure "out of the air." The government also introduced documentary evidence from which a jury could have reasonably found that Johnson's supposed $10,000 down payment on FTS was a sham; the evidence showed that Johnson and Hill had exchanged checks on the same day for

$10,000, the net result being that no down payment was actually made.

Sufficient evidence was also introduced to support Johnson's convictions arising out of the Eastgate application. Johnson admitted that he had negotiated Pamela Wells' alleged $40,000 down payment, and Mason testified that Johnson knew there was never any intention that the down payment would actually be paid. Both Mason and Wells also testified that Wells' financial statement for the loan guarantee on Eastgate was false and that Johnson was extensively involved in the arrangements for Eastgate's purchase. From this evidence, a reasonable jury could conclude beyond a reasonable doubt that Johnson participated in the misrepresentation of Wells' financial worth.

## B. Lister's Convictions

We also find sufficient evidence to support Lister's conviction for conspiracy. Mason expressly stated at trial that he had discussed with Lister the inclusion of false statements in the loan guarantee applications. Johnson in his statement to the FBI replied affirmatively when asked whether a conspiracy involving Hill, Lister and Mason existed. In addition to this direct evidence of Lister's involvement, there is substantial circumstantial evidence of Lister's participation in the conspiracy: he was the officer who processed the applications and submitted them to the SBA and FHA, and, although he claimed he did not know the false statements were in the forms, he admitted he knew Johnson and Hill had prior convictions;[7] he signed the letter to the SBA stating Hill intended to buy FTS from his father, even though, as the government's evidence convincingly showed, he knew that Hill owned FTS; and, as Mason testified, Lister was the individual who advised Mason on how much collateral they would need to claim to qualify for the loan guarantees. Based on the above direct and circumstantial evidence, a

---

**7.** Lister's defense, that he was unaware that the false statements were in the applications, was of course an issue for the jury.

reasonably cautious jury could have found beyond a reasonable doubt that Lister was part of the conspiracy.

■ The government's evidence against Lister as to the substantive counts was not as strong as that against Hill and Johnson. We need not, however, find independent evidence of Lister's direct participation in each substantive count of which he was convicted, because "[a] conspirator can be found guilty of a substantive offense based upon acts of a coconspirator done in furtherance of the conspiracy, unless the act 'did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" *United States v. Moreno*, 588 F.2d 490, 493 (5th Cir.1979), *cert. denied*, 441 U.S. 936, 947, 99 S.Ct. 2061, 2168, 60 L.Ed.2d 666 (quoting *Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946)). As the district court properly instructed the jury, to find Lister guilty there only needed to exist sufficient evidence for the jury to conclude that other coconspirators committed the acts with which he was charged and that such acts were a foreseeable part of the conspiracy.[8]

Such a finding is supported by the record. Among other evidence, Mason directly testified to Hill's and Johnson's participation in those counts of which Lister was also found guilty. Moreover, the acts were aimed at the accomplishment of the conspiracy's goal, obtaining federal loan guarantees, and thus were clearly foreseeable. The jury, therefore, could have reasonably found Lister guilty of the substantive counts.

## V. Extrinsic Acts Evidence

■ On redirect, Mason testified to a real estate transaction in which Lister, Johnson and Hill allegedly used false financial statements to obtain and sell a ficti-

tious second mortgage on some property. The judge initially had ruled that such testimony was inadmissible. On redirect, however, the judge allowed Mason to testify about the transaction because defense counsel during cross-examination had asked Mason about Lister's involvement in L & H Properties, a partnership between Lister and Hill and one of the companies involved in the fictitious mortgage scheme. The judge ruled, therefore, that defense counsel had "opened the door" and Mason would be allowed to testify as to Lister's involvement in L & H. After Mason's testimony, defense counsel moved for an instruction on use of "similar acts" evidence under Federal Rule of Evidence 404(b), which motion the government joined. The judge proceeded to give the instruction.

Lister now argues that Mason's testimony about the mortgage scheme was prejudicial error because it does not satisfy the requirements of Rule 404(b). The government contends that the evidence was properly admitted because it was used as a response to defense counsel's implication on cross-examination that Lister was not involved with L & H Properties. Because we find that the testimony was properly admitted as rebuttal evidence and did not violate F.R.Evid. 403, we need not address the defendant's argument based on F.R. Evid. 404(b).

Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We must determine, therefore, whether the testimony was relevant and, if so, whether its probative value outweighed its prejudicial effect.

On cross-examination, Lister's counsel had the following exchange with Mason:

---

8. The *Moreno* court did note that the doctrine of vicarious guilt may have due process limitations. 588 F.2d at 493. As in *Moreno*, however,

attributing the acts of Hill and Johnson to Lister is not so attenuated that such due process concerns would apply here.

Q. Isn't it true that you know of or had knowledge that Roy Lister and Buddy [Hill] never really put that corporation in effect as being together, in other words, Lister and Hill [L & H]?

A. It's my understanding it was a dummy corporation, dummy corporation.

. . . . .

Q. It was not put into—was not used by Mr. Lister, as far as you know, ever put into effect by him or Mr. Lister?

A. No, sir. That is not correct.

Q. I am saying it was not put into effect by Mr. Lister. Maybe you misunderstood my question.

A. They used that corporation in another deal on the Transmitter Road property, on Trailer City Estates.

Q. You're stating Mr. Lister was involved in that?

A. Yes, sir, he was.

Q. All right. As a stockholder or officer of the corporation.

A. He was involved in obtaining a second mortgage on—

Q. I'm not asking you that. I'm asking you if he was involved as a stockholder or an officer?

A. I don't know that.

Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Lister's familiarity and involvement with Hill's business affairs was a fact of consequence to the government's case, especially for the count alleging that Lister knew that Hill's statement that he was buying FTS from his father was false. The extent of Lister's involvement with L & H, therefore, was a significant fact, and Lister's role in the fictitious mortgage scheme was probative to his involvement in the partnership and his knowledge of Hill's business affairs. The probity of the mortgage scheme was further enhanced once defense counsel attempted to establish on cross-examination that Lister never actively participated in L & H.

Against the evidence's probative value, we must weigh the danger of prejudice. Here, the danger presented was that the jury would convict Lister based on the fictitious mortgage scheme involving L & H rather than on the evidence introduced for the charged offense.[9] *Cf. United States v. Beechum,* 582 F.2d 898, 914 (5th Cir.1978) (en banc). Although the district court may have been correct in initially determining that the prejudicial effect of the mortgage scheme outweighed its probative value, the court properly ruled that once defense counsel "opened the door" on cross-examination, by implying that Lister never really participated in L & H, the scheme's probative value was enhanced such that it outweighed its prejudicial effect. On redirect, therefore, the government was entitled to elicit rebuttal testimony from Mason as to whether Lister and Hill had in fact used L & H for business, and Mason's testimony about the mortgage scheme served that purpose. Moreover, the judge gave the jury cautionary instructions on the use of similar acts evidence both immediately after the testimony and during its closing charge, thus further minimizing the danger of prejudice.[10] *Cf. Beechum,* 582 F.2d at 917. We conclude that the judge did not abuse its discretion in admitting the testimony as rebuttal evidence to show Lister's involvement with L & H Properties.

## VI. Conclusion

Having found sufficient evidence to support appellants' convictions and having

---

**9.** The danger that the defendant would be convicted based on the extrinsic offense and not the charged offense is the same danger presented by similar acts evidence under Rule 404(b). Our analysis differs here from that for Rule 404(b) because we consider the evidence's relevancy in terms of rebuttal on redirect and not for the purposes outlined in Rule 404(b), such as showing motive, opportunity or intent.

**10.** Although the cautionary instruction is generally used for Rule 404(b) extrinsic acts evidence, we find that it served a similar purpose here in minimizing the prejudicial nature of the rebuttal evidence.

found no prejudicial error at trial, the convictions are AFFIRMED.